516 A.2d 363

Judith I. CAMPBELL, Appellee,

v.

Charles J. CAMPBELL, Appellant.

Judith I. CAMPBELL, Appellant,

v.

Charles J. CAMPBELL, Appellee.

Superior Court of Pennsylvania.

Argued April 7, 1986.

Filed Oct. 6, 1986.

484

Lester L. Greevy, Jr., Williamsport, for appellant in No. 325 and for appellee in No. 186.

Elliott B. Weiss, Williamsport, for appellant in No. 186 and for appellee in No. 325.

Before CIRILLO, President Judge, and BROSKY, ROWLEY, WIEAND, MONTEMURO, BECK, TAMILIA, POPOVICH and JOHNSON, JJ.

WIEAND, Judge:

Presently before this Court are cross-appeals from an order directing equitable distribution of marital property. Because of a unique procedural posture, however, we must first determine whether the decree of equitable distribution is properly before us for review.

Charles J. Campbell and Judith I. Campbell were married on November 28, 1963. In June, 1980, they separated; and on February 25, 1981, Judith commenced an action for divorce under the Divorce Code of 1980.[1] She requested a

---

1. Act of April 2, 1980, P.L. 63, No. 26, 23 P.S. § 101 et seq.

section 201(c)[2] divorce and advanced various economic claims. On May 19, 1983, Charles filed a counterclaim in which he alleged a cause of action for a fault divorce on grounds that Judith had been guilty of a course of conduct constituting indignities to his person. At a hearing before a master on July 18, 1983, the parties, by their respective counsel, stipulated that if Charles were to file a section 201(d)[3] affidavit, Judith would not contest the affidavit, and a section 201(d) divorce could be entered. Charles filed a section 201(d) affidavit on July 19, 1983, and no challenge was thereafter made by Judith.

In the master's report, filed December 2, 1983, the master recited that the parties had stipulated to an uncontested section 201(d) divorce. The master's recommended order, however, did not contain a decree in divorce. Instead, the recommended order was limited to a proposed scheme for distributing marital property. Both Judith and Charles filed exceptions to the master's report. On June 1, 1984, the trial court, after considering the exceptions of the parties, entered an order distributing the marital property. The trial court's order, however, did not include a decree of divorce. Charles filed an appeal in this Court from the order of equitable distribution; Judith filed a cross-appeal.

When the parties discovered that no divorce decree had been entered, they appeared before the trial court; and, on September 18, 1984; the trial court entered a divorce decree which incorporated the prior order of equitable distribution. In an accompanying opinion, the trial court observed that it had entered the order of equitable distribution on June 1, 1984 in the mistaken belief that a decree in divorce had previously been entered. The court suggested that the

**2.** 23 P.S. § 201(c). A divorce will be granted under § 201(c) when "a complaint has been filed alleging that the marriage is irretrievably broken and 90 days have elapsed from the date of filing of the complaint and an affidavit has been filed by each of the parties evidencing that each of the parties consents to the divorce."

**3.** 23 P.S. § 201(d). A § 201(d) divorce is granted upon a showing that the marriage is irretrievably broken and the parties have lived separate and apart for a period of at least three years.

parties had suffered from the same misconception. Relying on Pa.R.A.P. 1701(b)(6) and believing that the order of equitable distribution was a nonappealable, interlocutory order, the court concluded that the entry of a decree in divorce was not precluded by the pending appeals from the decree of distribution. See: Pa.R.A.P. 1701(b)(6).[4]

We are thus faced with an appeal and a cross-appeal which were taken from a pre-divorce order of equitable distribution entered in a case in which the trial court and the parties erroneously believed that a decree of divorce had already been entered. In fact, a final decree in divorce had not been entered at the time of the appeal. Unless otherwise permitted by statute or rule, an appeal will lie only from a final order. *Adoption of G.M.,* 484 Pa. 24, 27, 398 A.2d 642, 644 (1979); *Beasley v. Beasley,* 348 Pa.Super. 124, 126, 501 A.2d 679 (1985). A final order has been defined as one which ends the litigation or disposes of the entire case. *Fried v. Fried,* 509 Pa. 89, 94, 501 A.2d 211, 213 (1985). "[A]n order is interlocutory and not final unless it effectively puts the litigant 'out of court.'" *T.C.R. Realty, Inc. v. Cox,* 472 Pa. 331, 337, 372 A.2d 721, 724 (1977).

A pre-divorce order of equitable distribution, even one entered upon the mistaken assumption that a divorce decree has already been entered, is not a final order. A premature distribution of marital property does not terminate the divorce action. While "[t]he courts of common pleas have been given [subject matter] jurisdiction to hear and decide divorce actions and related economic claims[,] ... [t]o enter a decree of equitable distribution prior to a divorce decree ... is improper." *Reese v. Reese,* 351 Pa.Super. 521, 526, 506 A.2d 471, 474 (1986). The courts of common pleas are only empowered to make equitable distri-

---

**4.** This rule provides in pertinent part that "[a]fter an appeal is taken or review of a quasijudicial order is sought, the trial court or other government unit may: ... (6) Proceed further in any matter in which a nonappealable interlocutory order has been entered, notwithstanding the filing of a notice of appeal or a petition for review of the order."

bution contemporaneously with or subsequent to a decree in divorce. *Bacchetta v. Bacchetta,* 498 Pa. 227, 235, 445 A.2d 1194, 1198 (1982); *Reese v. Reese, supra,* 351 Pa.Super at 521, 506 A.2d at 473–474; *Drumheller v. Marcello,* 351 Pa.Super. 139, 140, 505 A.2d 305, 306 (1986); *Pastuszek v. Pastuszek,* 346 Pa.Super. 416, 424, 499 A.2d 1069, 1073 (1985); *Laxton v. Laxton,* 345 Pa.Super. 450, 455, 498 A.2d 909, 912 (1985); *Dech v. Dech,* 342 Pa.Super. 17, 22, 492 A.2d 41, 43 (1985). This is because the settlement of economic and property claims is merely a part of the trial court's broader power to terminate the marriage. Equitable distribution is an incident of divorce, not marriage.

█ It seems clear, therefore, that a pre-divorce decree distributing marital property is interlocutory. It cannot be reviewed until it has been rendered final by the entry of a decree in divorce.[5] Nevertheless, a final decree in divorce has now been entered in this action, and the decree of equitable distribution appears ripe for appellate review. Therefore, as in *Mandia v. Mandia,* 341 Pa.Super. 116, 491 A.2d 177 (1985), we disregard the inadvertent, procedural misstep taken by both counsel and enter upon a review of the trial court's order of distribution.

Our standard of review is clear. An order determining equitable distribution will be reversed only for an abuse of discretion. *Sergi v. Sergi,* 351 Pa.Super. 588, 591, 506 A.2d 928, 930 (1986); *LaBuda v. LaBuda,* 349 Pa.Super. 524, 528, 503 A.2d 971, 974 (1986). An abuse of discretion occurs if the trial court fails to follow correct legal procedure or misapplies the law. *Braderman v. Braderman,* 339 Pa.Super. 185, 190, 488 A.2d 613, 615 (1985). In determining whether a court has abused its discretion, we do not

**5.** Our decision in *Reese v. Reese, supra,* does not require a different result. There, we held that a spouse who had requested pre-divorce equitable distribution, had received the relief requested, and had acted in reliance thereon to accept the benefits thereof was estopped from denying the jurisdiction of the court to enter an order of equitable distribution after his wife had died without the entry of a final divorce decree. The decision in *Reese* was limited to the peculiar facts of that case and did not establish generally a right of appeal from a pre-divorce order distributing marital property.

usurp the trial court's duty as fact finder. *Barnhart v. Barnhart,* 343 Pa.Super. 234, 237, 494 A.2d 443, 444 (1985); *Ruth v. Ruth,* 316 Pa.Super. 282, 287, 462 A.2d 1351, 1353 (1983). The trial court's findings of fact, if supported by credible evidence, are binding upon a reviewing court and will be followed.

The parties' principal dissatisfaction with the trial court's order centers upon Husband's interest in Williamsport Candy Company, a partnership owned and operated by the Campbell family. Husband was not always a partner. The original firm was owned by Husband's uncle, Harold (65%), Husband's father, Richard (30%), and Husband's cousin, H.T. Collins (5%). Harold, however, was semi-retired and living in Florida. Therefore, by agreement, profits were distributed in a ratio different than the ownership interests. Thus, Harold and Richard each received forty percent of the profits, while H.T. Collins received twenty percent of the profits. In 1978, Richard Campbell gave to his son, Charles, one-half of his interest in the firm. This interest was valued by the parties at $26,000.00. Six Thousand ($6,000.00) Dollars was in the form of an outright gift. Charles borrowed the remaining Twenty Thousand ($20,-000.00) Dollars from the bank and paid it to his father in consideration for the balance of his father's interest in the firm. The loan, however, was repaid to the bank by Charles' father.

The trial court found that Husband's interest in the family business had been received as a gift and placed a value on it of $26,000.00. This interest, therefore, was held not to be marital property. See Divorce Code of April 2, 1980, P.L. 63, § 401(e)(3), 23 P.S. § 401(e)(3). A gift to a spouse remains the property of that spouse unless he or she manifests an intention to donate it to the entireties entity. *Coyle v. Coyle,* 282 Pa.Super. 221, 226, 422 A.2d 1085, 1088 (1980). See also: *DiFlorido v. DiFlorido,* 459 Pa. 641, 331 A.2d 174 (1975); *Uccellini v. Uccellini,* 423 Pa. 273, 223 A.2d 694 (1966). In the instant case, Husband did not manifest an intent to donate his interest in the family

business to the entireties, and the trial court so found. A gift to the entireties was not created merely because the proceeds of Husband's bank loan ($20,000.00) passed through a joint account on its way to Husband's father in payment for a portion of his interest in the business. The gift of this portion of the business was made by the father to the son, and that interest never vested in both husband and wife as tenants by the entireties. The transfer of the business interest was unequivocally to Husband, not to Husband and Wife by the entireties.

 Although Husband's interest in the family business was not marital property, the increase in the value thereof during marriage was distributable as "marital property." Divorce Code, *supra* § 401(e)(3), 23 P.S. § 401(e)(3). This increase in value was determined by the trial court to be One Hundred Sixteen Thousand ($116,000.00) Dollars. In arriving at this amount, the court found that the gift had had an initial value of Twenty-Six Thousand ($26,000.00) Dollars and a value of One Hundred Forty-Two Thousand ($142,000.00) Dollars when the couple separated. Husband, in his appeal, contends that the trial court's calculations of both values were in error. We disagree.[6]

**6.** The husband-appellant contends that the trial court abused its discretion when, in determining the value of the family business, the court refused to consider certain Dun & Bradstreet reports pertaining to the business and also when it failed to give adequate consideration to copies of partnership income tax returns for the years 1979, 1980 and 1981. We find no merit in these arguments. The trial court determined that the Dun & Bradstreet reports were hearsay, were inadmissible under any exception to the hearsay rule, and had not been received in evidence by the master. The record supports the trial court's determination. The income tax returns, although received in evidence, were not determinative of the value of the business and were not discussed by the master in his report. The husband's exceptions to the master's report did not contain any reference to this omission; and, therefore, the trial court did not expressly discuss the income tax returns in its opinion. The court's failure to discuss the income tax returns under these circumstances does not suggest that the income tax returns were ignored. Although they had been received in evidence, the weight to be accorded them was for the fact finder to determine.

■ Husband asserts that the trial court's computation of the initial worth of the gift was erroneous because it had not been based upon the fair market value of his interest. An examination of the record reveals, however, that no evidence of the market value of the interest was presented at the hearing before the master. Indeed, there was no evidence that there even existed a market for Husband's fractional interest in the wholesale business which was wholly owned and operated by his family. The only evidence of the original value of Charles' interest was provided in a written agreement entered by the partners of the family business wherein the value of Charles' ownership was affixed at $26,000.00. From this agreement, the trial court could find that the value of Charles' interest when first acquired was $26,000.00. We perceive no error in the court's finding.

■ The trial court also found, as we have observed, that the value of Husband's interest at the time of separation was $142,000.00. This finding was premised upon testimony by a certified public accountant who had examined the partnership's income tax returns for the relevant years. Husband contends that this finding was erroneous, because the trial court refused to reduce the book value of his interest by the face amount of a note which he had executed on July 2, 1979 in favor of Richard W. or Iva L. Campbell for $91,198.93. The court held that the note "did not represent part of the purchase price of the 20 percent interest, but ... was ... given as security to the partners of the company to insure them that Charles would make no claim for past profits still held by the partnership." In so holding, the court found that the parties had not intended the note to be paid and that the note, therefore, did not constitute evidence of an actual indebtedness. This finding by the trial court is supported by the undisputed testimony of Charles' father. He admitted that no money had ever changed hands and indeed, was not intended to change hands as a result of the transaction. The trial court did not err, therefore, by refusing to consider the note in its calcu-

lation of the increased value of Husband's interest in the family business. Because the court's finding of the value of the interest upon separation is supported by credible evidence, we are bound by it.

Husband also contends that his proprietary interest in the business, being one-half of his father's ownership interest, is fifteen (15%) percent, not twenty (20%) percent as determined by the master and the trial court. Even though he is entitled to receive twenty (20%) percent of the profits, he argues, the book value of his interest should have been based on fifteen (15%) percent of the value determined by the court. This error, if error it be, was not raised by exceptions to the master's report and was neither argued to nor considered by the trial court. The issue, therefore, was waived; it has not been preserved for appellate review. See: *LaBuda v. LaBuda, supra,* 349 Pa.Super. at 524, 503 A.2d at 978; Pa.R.C.P. 1920.55(a). See also: *Kovach v. General Telephone Company of Pennsylvania,* 340 Pa.Super. 144, 149, 489 A.2d 883, 885 (1985); *Neshaminy Water Resources Authority v. Del-Aware Unlimited, Inc.,* 332 Pa.Super. 461, 469, 481 A.2d 879, 883 (1984); Pa.R.A.P. 302(a).

Wife, in her cross-appeal, contends that the trial court erred when it found that the business had no "good will" value. At the hearing before the master, the accountant upon whose testimony the trial court relied to establish the book value of Husband's interest testified that the business possessed a "good will" value and that Husband's share thereof was $136,000.00. Both the master and the trial judge rejected the accountant's testimony regarding good will value and accepted the testimony of Richard Campbell, Charles' father and one of the partners, that the partnership business, because of its inherent nature, lacked a separate good will value. Richard Campbell testified that the firm had purchased several candy companies during its history and had never paid a separate amount for good will. The nature of the business, he said, was such that good will did not attach. He explained: "The candy business and the

cigarette and the cigar business is different than most businesses because you are selling the same thing that five or six other jobbers in the same town are selling. You have nothing that is all your own. You are selling Camel cigarettes, Winston cigarettes, Chesterfield, everybody's got them.... In other words, if a man goes out and sells it for ten cents less than you do, you got to meet his price or you can't sell it." The trial court accepted this testimony and relied upon it, while finding unworthy of belief the contrary testimony by the accountant. The accountant's testimony was not credible, the court said, because he failed to:

1. testify that the partnership had any elements that would result in a competitive advantage;

2. testify to the partnership's reputation or the prospect for repeat business;

3. consider the economic outlook of the partnership; (N.T. 72)

4. consider the economic outlook of the specific type of business in which the partnership was engaged; (N.T. 72)

5. use financial statements, but instead used only federal income tax returns; (N.T. 66)

6. did not consider competition and methods of distribution;

7. express familiarity with the partnership's competitive position in the marketplace;

8. express a familiarity with the sales of any other similar businesses; or,

9. take into consideration that only a fractional interest (20 per cent) was the subject of the fair market valuation.

Trial Court Opinion at 11–12.

In reviewing the trial court's finding, we may not substitute our judgment for that of the trial court. See: *Burbage v. Boiler Engineering and Supply Co.*, 433 Pa. 319, 323, 249 A.2d 563, 566 (1969); *Brasile v. Estate of Brasile*, 354 Pa.Super. 400, 405, 512 A.2d 10, 13 (1986), quoting *Lombardo v. DeMarco*, 350 Pa.Super. 490, 494, 504 A.2d 1256, 1258

(1985). Whether we would have made the same finding, therefore, is not determinative. Rather, we must affirm the trial court's finding if it is based upon adequate evidence and does not suggest a capricious disregard of credible evidence to the contrary. See: *Brasile v. Estate of Brasile, supra; Standard Pipeline Coating Co. v. Solomon & Teslovich, Inc.,* 344 Pa.Super. 367, 377–378, 496 A.2d 840, 845 (1985). Limited as we are by the applicable standard of review, we will not interfere with the finding of the trial court regarding the absence of a separate good will value.

Finally, Wife argues that the trial court erred in failing to award her counsel fees and costs. We will reverse a determination of fees and costs only for an abuse of discretion. *Pangallo v. Pangallo,* 329 Pa.Super. 25, 31, 477 A.2d 885, 888 (1984); *Prozzoly v. Prozzoly,* 327 Pa.Super. 326, 331, 475 A.2d 820, 823 (1984). The trial court determined that it was not necessary that Judith be awarded counsel fees because "[n]ot only will the plaintiff receive some $52,000.00 from equitable distribution but she also received approximately $30,000.00 in cash and property from post separation distribution of assets." Trial Court Opinion at 15. Under the circumstances here present, we cannot say that the trial court abused its discretion when it refused to award Wife counsel fees and costs.

Decree affirmed.

BECK, J., files a concurring opinion.

TAMILIA, J., concurs in the result.

BECK, Judge, concurring:

Although I agree with the majority's affirmance of the lower court, I believe the majority opinion requires supplementation in two regards. First, the majority fails to provide adequate support for its decision that the order before us is appealable at this time. Second, the majority opinion does not provide sufficient guidance to the bench and bar on the existence and valuation of goodwill in a business. It renders its decision without making any refer-

ence to the larger issue of goodwill as an element of economic value in a business subject to equitable distribution.

## APPEALABILITY.

The majority correctly notes that under the Divorce Code, the entry of a divorce decree is a prerequisite to an order for alimony or equitable distribution of property. *Dech v. Dech*, 342 Pa.Super. 17, 22, 492 A.2d 41, 43 (1985). As we thoroughly demonstrated in *Dech*, numerous sections of the Code refer to the entry of an order of equitable distribution only after or in conjunction with the entry of a divorce decree. *Id.* (citing 23 P.S. §§ 104, 301(a), 401(b) & (j), 402). The statutory sections which so provide are based on sound concerns for the possible ramifications of allowing distribution of marital property to predate divorce. *Id.*

Given the prohibition on a pre-divorce equitable distribution order, any such order must be deemed to be interlocutory. The majority correctly states that such an order does not terminate the divorce action and, in most instances, could not be immediately reviewed.[1] However, after so stating, the majority merely concludes that in this case an exception should be made and proceeds to consider the substantive issues on appeal. At minimum, I believe that there should be additional cautionary statements outlining the extremely limited circumstances in which such an exception will be allowed.

In *Reese v. Reese*, 351 Pa.Super. 521, 506 A.2d 471 (1986), this Court allowed such a limited exception and couched its opinion in appropriate limiting language. In that case, the trial court had entered an order of equitable distribution prior to entering the divorce decree. The wife died before the divorce was granted. On petition of the wife's estate, the trial court ordered the husband to comply with the

---

1. In fact, entry of an equitable distribution order before divorce could be construed to be outside the power of the trial court. Thus, the order presently before us is not only interlocutory but also may be considered to be void. *Cf. Reese v. Reese*, 351 Pa.Super. 521, 506 A.2d 471 (1986).

equitable distribution order. This court affirmed. *Id.*, 351 Pa.Superior Ct. at 521, 506 A.2d at 475. Citing *Dech,* the *Reese* court noted that the entry of the equitable distribution order before divorce has been "ill-advised". However, it also concluded that in consideration of all the pertinent and somewhat extraordinary circumstances of that case, the distribution order should be permitted to stand. These circumstances included the fact that the husband had been the party initially requesting the pre-divorce distribution order, neither party had objected to the untimeliness of the order or appealed from it, and both had acted in reliance on the order by taking sole possession of the property awarded to them. *Id.*, 351 Pa.Superior Ct. at 521, 506 A.2d at 473–4. Given this conduct by the parties, particularly by the appellant-husband, and reasoning that the husband was estopped from objecting to the order, this court allowed it to stand.

Similarly, in *Mandia v. Mandia,* 341 Pa.Super. 116, 491 A.2d 177 (1985), this Court permitted an appeal which was described by counsel for appellant as being from the trial court's order bifurcating the parties' divorce from their economic claims. The divorce decree was entered six days after the bifurcation order. The court nevertheless accepted the appeal, explaining that the bifurcation order had clearly been entered only because the trial court intended shortly thereafter to enter the divorce decree. Moreover, the court emphasized that the true substance of the appeal concerned the order entering the divorce decree and refused to ignore that fact merely because of counsel for appellant's "uninformed procedural misstep". *Id.*, 341 Pa.Superior Ct. at 119, 491 A.2d at 178–9.

This case presents a situation similar to those found in *Reese* and *Mandia* and thus poses somewhat of a dilemma. This case represents the rare exception to the rule that the divorce decree is a prerequisite to equitable distribution, *Dech,* and that an appeal relating to equitable distribution will not lie absent a divorce decree. On the one hand, the procedure followed by the trial court was clearly in error. However, the trial court committed that error only because

it believed the divorce decree had already been entered. Both parties and their counsel apparently shared that belief. As the trial court was careful to point out in its opinion accompanying the divorce decree, both parties appealed immediately after entry of the equitable distribution order, apparently because they thought the divorce decree had previously been entered. The trial court also stated that at the master's hearing, the parties had stipulated on the record to a § 201(d) divorce. Thus, the trial court felt confident that the entry of the decree, although untimely, was in accord with both parties' wishes. Opinion of the Trial Court, dated 9/18/84, at pp. 2–4.

I would, therefore, agree with the majority that we have jurisdiction over this appeal, but only because the timing of the divorce decree resulted simply from a mistake by the court, both parties and their counsel and because entry of the decree after the equitable distribution order did not prejudice the rights of either party.

### *Goodwill.*

Goodwill can be defined as the advantage or benefit that inheres in a business beyond the mere value of the tangible assets of the business and which is attributable to the good reputation of the business or those qualities which cause existing customers to continue to patronize the business. In other words, goodwill is the expectancy of repeat patronage, the qualities of a business that make its customers return. *Quaid v. Philadelphia Tax Review Board*, 188 Pa.Super. 623, 630, 149 A.2d 557, 560 (1959); *Dugan v. Dugan*, 92 N.J. 423, 457 A.2d 1 (1983). The goodwill of a small, closely held business can represent a large portion of the value of that business. *See Gutzeit v. Gutzeit*, 200 Pa.Super. 401, 405, 189 A.2d 324 (1963) (allocatur denied).

In this case, the testimony offered as to the goodwill of the Williamsport Candy Company (the "Company") was confined to that of a certified public accountant called by the appellee-wife to give expert testimony as to the value of the Company, and of Richard W. Campbell, appellant-hus-

band's father and a partner in the Company. Mindful of our limitations in reviewing the factual findings of a lower court in a matter like this, I agree with the majority's conclusion that no value should be attributed to goodwill in the valuation of the Company for purposes of equitable distribution. I base this conclusion on the fact that the testimony of appellee's expert does appear to be deficient in the ways noted by the trial court and reiterated by the majority. Those deficiencies all relate to the expert's failure to acquaint himself with the particulars of the Company's business, its methods of obtaining and preserving a competitive position in the marketplace, or with the candy and cigarette distributing business in general. (N.T. 72, 87–8). Indeed, the expert based his conclusion that the Company possessed goodwill with an ascertainable value on a purely numerical and formulistic calculation he made based entirely on his review of the Company's tax returns for three consecutive years. (N.T. 66–7). These returns were the only data regarding the Company that apparently was provided to the expert to use in valuing the Company. (N.T. 67).

The importance of these deficiencies in the expert's testimony is obvious when analyzed in light of the prevailing standards for valuation of a closely held business like the Company for equitable distribution purposes. Many courts refer to the Internal Revenue Service's Revenue Ruling 59–60 as providing a reliable method of valuation for such businesses. 1959–1 CB 237; *Bowen v. Bowen*, 96 N.J. 36, 473 A.2d 73 (1984).

Revenue Ruling 59–60 lists several basic factors that should be considered in valuing such a business.[2] These factors include, *inter alia*, the nature of the particular business being valued and the history of the enterprise from its inception, the condition and outlook of the specific industry in which the business is engaged and whether the

2. Revenue Ruling 59–60 specifically relates to valuation of such businesses for estate and gift tax purposes. 1959—1 CB 237.

business has goodwill or other intangible value. 1959—1 CB 237. Obviously the analysis of the first two of the foregoing factors is pertinent to whether the business has goodwill and, if so, what the goodwill is worth. Given the definition of goodwill provided above, it is obvious that a consideration of the particular history and mode of doing business of the company being valued in relation to those of other businesses in the same industry is crucial to determining the existence and value of goodwill.

Although appellee's expert repeatedly referred to Revenue Ruling 59–60 as having been the standard for his valuation, in fact he appears not to have sufficiently followed the ruling's valuation method, particularly as to the goodwill of the Company. In fact, the expert specifically stated that he had no familiarity with the candy and cigarette distributing business nor with the Company's competitive position in the market. (N.T. 72, 87–8). Thus, I agree with the majority that appellee failed to show that the business has goodwill or, if it does, what the value of the goodwill is.

I must emphasize that my conclusion in this regard is based entirely on the deficiencies in the appellee's expert testimony.[3] But that is where my concurrence with the analyses of the trial court and the majority on this issue ends. Unlike the trial court and the majority, I find the testimony of Mr. Campbell, appellant's father and a partner in the Company, on the goodwill issue both unqualified and unpersuasive. Mr. Campbell testified that it was in the nature of the Company's business that it would not have any goodwill. In other words, outside of any quantitative issue as to value, Mr. Campbell stated that the Company had no goodwill in a qualitative sense. He further stated

---

**3.** The Divorce Code does not expressly address the valuation of marital property for equitable distribution purposes or the allocation of burden of proof as to valuation issues. The court must rely on the parties to submit adequate evidence of value. *Semasek v. Semasek,* 331 Pa.Super. 1, 7, 479 A.2d 1047, 1051 (1984); *Gee v. Gee,* 314 Pa.Super. 31, 460 A.2d 358 (1983).

that one indicia of this lack of goodwill was the fact that the Company had purchased seven other candy distributors in the past and had never paid any amount for goodwill. (N.T. 140–42).

First, it should be noted that Mr. Campbell himself admitted to his lack of expertise as to the valuation of the Company. (N.T. 195). Moreover, the trial court also noted Mr. Campbell's lack of expertise in this regard when it expressly discredited his testimony as to the total value of the Company. Opinion of the Trial Court, dated 6/1/84, at p. 10.

In addition to these general indicia of incredibility are the specific substantive flaws in Mr. Campbell's testimony. The majority's failure to highlight these flaws and its acceptance of Mr. Campbell's testimony raise the suggestion that goodwill is frequently not a part of economic value of a small closely held business. Indeed, the opinion suggests that the qualitative lack of goodwill can be established simply through the testimony of an admitted non-expert and possibly interested witness regarding the terms of acquisitions of similar businesses. These suggestions are, in my opinion, seriously misleading.

As previously noted, Revenue Ruling 59–60 itself indicates that whether a closely held business has goodwill or other intangible value is always a factor to be considered in valuing such a business. This indicates to me that it is more likely than not that a business like the Company, which has been in operation for a substantial period of time and has exhibited some degree of competitiveness in the marketplace, does have goodwill. Mr. Campbell's testimony that it is in the "nature" of a distributorship business not to have goodwill is unconvincing. Such testimony fails to consider a myriad of qualities the Company might have acquired that would encourage the repeat patronage of its customers. For example, the Company may have established a reputation for reliability for prompt delivery, and

for maintaining a broad range of inventory and, thereby, increased its competitive position.

Further, Mr. Campbell's testimony that in past acquisitions of similar businesses the Company had never paid for goodwill is not telling. On cross-examination, Mr. Campbell testified that the last of these acquisitions occurred approximately thirty years ago. (N.T. 190–91). Even more importantly, Mr. Campbell's testimony indicates that in fact these transactions were *not* acquisitions of similar businesses. In each such transaction, the Company purchased only the saleable inventory and certain of the accounts receivable of the other business. The Company paid cost for the inventory and face value of the accounts, minus a discount presumably to reflect the risk of uncollectibility. The Company did not, for example, buy the fixed assets or customer lists. (N.T. 191–92). Thus, it is highly likely that goodwill would not factor in such a transaction, which amounted to no more that a purchase of *some* of the assets of the other business. This does not convince me that those businesses did not have any goodwill in a qualitative sense.

Even if those transactions had been acquisitions of an entire business, the failure to allocate any of the price to goodwill proves nothing. The transaction could have been a distress sale. Indeed, Mr. Campbell suggested that the last of these transactions by the Company was a distress sale when he testified that the sellers had come to the Company and requested that it buy them out. (N.T. 193–4). Lastly, it is common knowledge that the allocation by the parties of the total purchase price among the various assets of an acquired business is a matter of negotiation, influenced by many considerations including the tax consequences of the allocation.

In sum, goodwill is often a substantial element of value in a closely held business and should be subject to valuation through credible expert testimony and goodwill should be subject to equitable distribution. I disagree with any suggestion to the contrary by the majority.